# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN C. GORMAN, an individual,
            *Plaintiff-Appellant,*

v.

WOLPOFF & ABRAMSON, LLP;
MBNA AMERICA BANK, N.A.,
           *Defendants-Appellees.*

No. 06-17226

D.C. No.
CV-04-04507-JW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
July 17, 2008—San Francisco, California

Filed January 12, 2009
Amended October 21, 2009

Before: Richard A. Paez and Marsha S. Berzon,
Circuit Judges, and Harold Baer,* District Judge.

Opinion by Judge Berzon

---

*The Honorable Harold Baer, Jr., Senior United States District Judge
for the Southern District of New York, sitting by designation.

## COUNSEL

John C. Gorman and Charles J. Stiegler, San Jose, California, for the plaintiff-appellant.

Tomio B. Narita and Jeffrey A. Topor, San Francisco, California, for the defendants-appellees.

## ORDER

The opinion filed January 12, 2009, is hereby amended. The amended opinion is attached hereto.

With these amendments, the panel unanimously has voted to deny Appellant's petition for rehearing en banc and Appellee's petition for panel rehearing and petition for rehearing en banc.

The full court has been advised of the petitions for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing is DENIED and the petitions for rehearing en banc are DENIED. No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

BERZON, Circuit Judge:

John Gorman tried to buy a satellite television system using his credit card, issued by MBNA America Bank. He was unsatisfied with the system purchased, and lodged a challenge with MBNA to dispute the charge. Unhappy with MBNA's response, Gorman instituted this lawsuit against MBNA, alleging violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x, libel, and violations of California Civil Code section 1785.25(a). The district court dismissed his California statutory claim and granted MBNA summary judgment on the other causes of action. *Gorman v. Wolpoff & Abramson, LLP* ("*Gorman I*"), 370 F. Supp. 2d 1005 (N.D. Cal. 2005); *Gorman v. Wolpoff & Abramson, LLP* ("*Gorman II*"), 435 F. Supp. 2d 1004 (N.D. Cal. 2006). We affirm in part and reverse in part.

## I.  BACKGROUND

In December 2002, John Gorman paid for the delivery and installation of a new satellite TV system on a Visa credit card

issued by MBNA America Bank ("MBNA"). The charge, $759.70, was posted on his January 2003 credit card statement. According to Gorman, the merchant, Four Peaks Home Entertainment ("Four Peaks"), delivered a used and defective TV system and botched the installation, damaging his house in the process. Gorman told Four Peaks he was refusing delivery of the goods and asked for a refund, but Four Peaks refused to refund the charges unless Gorman arranged to return the TV system. The defective equipment is still in Gorman's possession.[1]

In February 2003, Gorman notified MBNA that he was disputing the charges and submitted copies of emails between himself and Four Peaks. The attached emails showed that Gorman had informed a Four Peaks representative that the delivered goods were "unacceptable and [were] rejected." He also noted damage from the installation and notified Four Peaks that he "plan[ned] to dispute the credit card charges in their entirety, as the damage exceeds the amount of the charges."

MBNA responded to the dispute notice with a request for additional information from Gorman about the dispute, including proof that the merchandise had been returned. A month passed, and MBNA wrote Gorman again, stating that as he had not responded, it assumed the charge was no longer

---

[1]MBNA claims that Four Peaks shipped Gorman new, replacement equipment and that Gorman retains both the defective and replacement equipment. Gorman disputes having received any replacement system. Gorman also claims that he made the merchandise available to Four Peaks for pickup, and that doing so was sufficient to require a refund under Cal. Com. Code section 2602(2)(b) ("If the buyer has before rejection taken physical possession of goods in which he does not have a security interest under the provisions of this division (subdivision (3) of Section 2711), he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them."). He also testified in his deposition that Four Peaks never sent him pre-paid shipping labels. It is not clear whether he would have shipped the merchandise back had he received such labels.

disputed. Gorman answered that he continued to dispute the charge, and referred MBNA to his original notice of dispute. He did not claim to have returned the equipment, but stated that the merchandise "has been available for the merchant to pick up." MBNA again requested proof that the goods had been returned; Gorman did not reply.

In April 2003, MBNA informed Gorman that it was "unable to assist [him] because the merchandise has not been returned to the merchant." Gorman called an MBNA representative saying, again, that all relevant information was in his original letter. MBNA then contacted Four Peaks, which told MBNA that it had shipped replacement equipment to Gorman but that he had not sent the old equipment back to them.

In July 2003, MBNA again informed Gorman that it could not obtain a credit on his behalf without further information from him. Gorman, who is a lawyer, responded in writing on his law firm's letterhead, stating that MBNA had all the information it needed, that he had left several unanswered messages with MBNA asking to speak with someone about the dispute, and that he would "never" pay the disputed charge. He further stated that MBNA had violated the Fair Credit Billing Act, that he was "entitled to recover attorneys' fees for MBNA's violation," and that he was offsetting his legal fees against his current account balance and so would make no more payments on the card, for the TV system or anything else.[2] The balance at that time was more than $6,000.[3]

Gorman's letter to MBNA worked, at least temporarily. In

---

[2]Gorman has not indicated any specific basis for his fees claim. He refused to answer questions at his deposition about whether these fees were for services he had personally performed, claiming attorney-client and work product privilege. No suit had been filed at the time Gorman claimed entitlement to these fees.

[3]As far as the record reveals, the entire balance remains unpaid.

August 2003, MBNA removed the Four Peaks charge and related finance charges and late fees from Gorman's credit card bill. Over the next two months, MBNA again contacted Four Peaks, which once more informed MBNA that it would not issue a credit for Gorman's charge until he returned the refused equipment. When MBNA called Gorman, he informed them he had the merchandise and "ha[d] no intention of ever [returning] it." In October, MBNA reposted the charge to Gorman's account.

After he stopped making payments on his card, Gorman claims, he received numerous harassing phone calls. During one of these calls, Gorman alleges, an MBNA representative told him, "We're a big bank. You either pay us or we'll destroy your credit."

In January 2004, MBNA reported Gorman's account to the credit reporting agencies ("CRAs") as "charged-off."[4] Between May 2004 and November 2005, Gorman informed the three major credit reporting agencies (Equifax, Trans-Union, and Experian) that their credit reports included inaccurate information.

As required by federal law, the CRAs sent MBNA notices of dispute containing descriptions of Gorman's complaints (as understood by the CRAs) and asking the bank to verify the accuracy of his account records. MBNA responded by reviewing the account records and notes. After ascertaining that its prior investigation did not support Gorman's claimed dispute, MBNA notified the CRAs that the delinquency was not an error. According to Gorman, MBNA did not notify the

---

[4]MBNA also referred the debt to a law firm, Wolpoff & Abramson, for collection. The firm's attempt to collect the debt gave rise to unfair debt collection practices claims in Gorman's complaint. Gorman does not appeal the district court's entry of judgment against him on these claims.

CRAs that the charges remained in dispute, and the CRAs did not list the charges as disputed.[5]

Since his credit reports began listing his MBNA account as delinquent, Gorman has been denied credit altogether or offered only high interest rates on at least three occasions. He contends that the MBNA account is the only negative entry on his credit report.

In September 2004, Gorman sued MBNA. The complaint alleges violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x and a California credit reporting law, California Civil Code section 1785.25(a), and also alleges a claim for libel. Gorman seeks injunctive relief, damages resulting from MBNA's reporting of his account, and damages from lost wages for the time he spent dealing with his credit that he would have otherwise spent billing clients. The district court dismissed Gorman's California statutory claim as preempted and granted MBNA summary judgment on all other claims. Gorman timely appeals.

For the reasons stated below, we affirm in part and reverse in part the district court's grant of summary judgment on the FCRA claims; we affirm the district court's grant of summary judgment on Gorman's libel claim; and we reverse the district court's dismissal of Gorman's California statutory claim.

## II. ANALYSIS

This case comes to us on summary judgment. We review a grant of summary judgement *de novo*. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004). Summary judgement is appropriate where, "drawing all reasonable inferences sup-

---

[5]Gorman did not initially supply the district court with his credit reports. In support of his motion to reconsider the district court's summary judgment order, however, Gorman submitted copies of his credit reports, which include no indication that the MBNA account is disputed.

ported by the evidence in favor of the non-moving party," the court finds "that no genuine disputes of material fact exist and that the district court correctly applied the law." *Id.* (internal quotation omitted). The non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986)).

Questions of statutory interpretation and federal preemption are, of course, reviewed *de novo*. *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1047 (9th Cir. 2007); *Davis v. Yageo Corp.*, 481 F.3d 661, 673 (9th Cir. 2007).

## A.  Fair Credit Reporting Act Claims

### 1.  Statutory Background

Congress enacted the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x,[6] in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 127 S.Ct. 2201, 2205 (2007). As an important means to this end, the Act sought to make "consumer reporting agencies exercise their grave responsibilities [in assembling and evaluating consumers' credit, and disseminating information about consumers' credit] with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). In addition, to ensure that credit reports are accurate, the FCRA imposes some duties on the sources that provide credit information to CRAs, called "furnishers" in the statute.[7] Section 1681s-2 sets forth "[r]esponsibilities of fur-

---

[6]All references to the FCRA hereafter are to 15 U.S.C.

[7]"The most common . . . furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies." H.R. Rep. No. 108-263, at 24 (2003).

nishers of information to consumer reporting agencies," delineating two categories of responsibilities.[8] Subsection (a) details the duty "to provide accurate information," and includes the following duty:

> (3) Duty to provide notice of dispute
>
> If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

§ 1681s-2(a)(3).

Section 1681s-2(b) imposes a second category of duties on furnishers of information. These obligations are triggered "upon notice of dispute"— that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information. *See* § 1681i(a)(2) (requiring CRAs promptly to provide such notification containing all relevant information about the consumer's dispute). Subsection 1681s-2(b) provides that, after receiving a notice of dispute, the furnisher shall:

> (A) conduct an investigation with respect to the disputed information;
>
> (B)  review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) . . . ;
>
> (C)  report the results of the investigation to the [CRA];

---

[8]This section was added by the Consumer Credit Reporting Reform Act of 1996, Pub. L. No. 104-208, § 2413, 110 Stat. 3009-447. Additional amendments, not relevant here, were made by the Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108-159, 117 Stat. 1952.

(D)   if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . . ; and

(E)   if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete [or] (iii) permanently block the reporting of that item of information [to the CRAs].

§ 1681s-2(b)(1). These duties arise only after the furnisher receives notice of dispute from a CRA; notice of a dispute received directly from the consumer does not trigger furnishers' duties under subsection (b). *See id.*; *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002).

The FCRA expressly creates a private right of action for willful or negligent noncompliance with its requirements. §§ 1681n & o; *see also Nelson*, 282 F.3d at 1059. However, § 1681s-2 limits this private right of action to claims arising under subsection (b), the duties triggered upon notice of a dispute from a CRA. § 1681s-2(c) ("Except [for circumstances not relevant here], sections 1681n and 1681o of this title do not apply to any violation of . . . subsection (a) of this section, including any regulations issued thereunder."). Duties imposed on furnishers under subsection (a) are enforceable only by federal or state agencies.[9] *See* § 1681s-2(d).

---

[9]*Nelson* explained the likely reason for allowing private enforcement of subsection (b) but not subsection (a) as follows:

Congress did not want furnishers of credit information exposed to suit by any and every consumer dissatisfied with the credit information furnished. Hence, Congress limited the enforcement of the duties imposed by § 1681s-2(a) to governmental bodies. But Congress did provide a filtering mechanism in § 1681s-2(b)

Gorman alleges that MBNA violated several of the FCRA "furnisher" obligations. We hold that some of the alleged violations survive summary judgment and some do not.

## 2.   MBNA's "investigation" upon notice of dispute

Gorman's first allegation is that MBNA did not conduct a sufficient investigation after receiving notice from the CRAs that he disputed the charges, as required by § 1681s-2(b)(1)(A). As Gorman's claim arises under subsection (b), it can be the basis for a private lawsuit. *See Nelson*, 282 F.3d at 1059-60. We must decide (1) whether § 1681s-2(b)(1)(A) requires a furnisher to conduct a "reasonable" investigation, and if so, (2) whether a disputed issue of material fact exists as to the reasonableness of MBNA's investigation.

### a.   Must an Investigation be Reasonable?

**[1]** The text of the FCRA states only that the creditor shall conduct "an investigation with respect to the disputed information." § 1681s-2(b)(1)(A). MBNA urges that because there is no "reasonableness" requirement expressly enunciated in the text, the FCRA does not require an investigation of any particular quality; *any* investigation into a consumer's dispute — even an entirely unreasonable one — satisfies the statute.

**[2]** This court has not addressed MBNA's contention about

---

by making the disputatious consumer notify a CRA and setting up the CRA to receive notice of the investigation by the furnisher. *See* 15 U.S.C. § 1681i(a)(3) (allowing CRA to terminate reinvestigation of disputed item if CRA "reasonably determines that the dispute by the consumer is frivolous or irrelevant"). With this filter in place and opportunity for the furnisher to save itself from liability by taking the steps required by § 1681s-2(b), Congress put no limit on private enforcement under §§ 1681n & o.

*Nelson*, 282 F.3d at 1060.

the FCRA's investigation requirement.[10] But, MBNA made —
and lost — the same argument before the Fourth Circuit.
*Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 429-31 (4th
Cir. 2004). Concluding that the statute includes a requirement
that a furnisher's investigation not be unreasonable, the
Fourth Circuit first noted that the plain meaning of the term
"investigation" is a " 'detailed inquiry or systematic examina-
tion,' " which necessarily "requires some degree of careful
inquiry." *Id.* at 430 (quoting *Am. Heritage Dictionary* 920
(4th ed. 2000)). Second, the Fourth Circuit reasoned that
because the purpose of the provision is "to give consumers a
means to dispute — and, ultimately, correct — inaccurate
information on their credit reports," *id.* at 430-31, a "superfi-
cial, *un*reasonable inquir[y]" would hardly satisfy Congress'
objective. *Id.* at 431. The Seventh Circuit, without discussing
the issue, has also found an implicit reasonableness require-
ment. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825,
827 (7th Cir. 2005) ("Whether a defendant's investigation
[pursuant to § 1681s-2(b)(1)(A)] is reasonable is a factual
question normally reserved for trial."); *see also Johnson*, 357
F.3d at 430 n.2 ("[D]istrict courts that have considered the
issue have consistently recognized that the creditor's investi-
gation must be a reasonable one." (citing cases)).

**[3]** The Fourth Circuit's reasoning in *Johnson* is entirely
persuasive. By its ordinary meaning, an "investigation"
requires an inquiry likely to turn up information about the
underlying facts and positions of the parties, not a cursory or
sloppy review of the dispute. Moreover, like the Fourth Cir-
cuit, we have observed that "a primary purpose for the FCRA
[is] to protect consumers against inaccurate and incomplete
credit reporting." *Nelson*, 282 F.3d at 1060. A provision that

---

[10]District courts in this circuit have assumed that § 1681s-2(b)(1)(A)
requires a reasonable investigation. *See, e.g.*, *Smith v. Ohio Sav. Bank*, No.
2:05-cv-1236, 2008 WL 2704719, at *2 (D. Nev. July 7, 2008); *Thomas
v. U.S. Bank, N.A.*, No. CV 05-1725, 2007 WL 764312, at *4 (D. Or. Mar.
8, 2007).

required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry. MBNA counters by pointing to § 1681i(a)(1)(A), which provides, in relevant part (with emphasis added):

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a *reasonable reinvestigation* to determine whether the disputed information is inaccurate . . . .

Thus, MBNA argues, Congress specified a "reasonable" investigation in another part of the statute, and purposely chose not to do so for furnishers of information.

It is most often the case that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation and citation omitted). But we should be careful not to read too much into the apparent disparity in language upon which MBNA relies. Where, as here, there are convincing alternative explanations for a difference in statutory language, the presumption applies with much less force. *See Field v. Mans*, 516 U.S. 59, 67-69 (1995) ("Without more, the [negative] inference might be a helpful one. But [where] there is more . . . the negative pregnant argument should not be elevated to the level of interpretive trump card.").

As we have noted, the term "investigation" on its own force implies a fairly searching inquiry. It is thus likely that, if any-

thing, the "reasonable" qualifier with regard to *re*investigations by CRAs signals a *limitation* on the CRAs' duty, not an expansion of it beyond what "investigation" itself would signal. And, indeed, the statute goes on to spell out the CRA's investigative duty in some detail, requiring, inter alia, that the CRA provide notification of the dispute within five business days of receipt of notice of a dispute. The furnisher's investigation obligation under § 1681 is triggered by receiving the CRA notification, required as a central aspect of the CRA's own investigation, and includes the obligation to "report the results of [its] investigation to the [CRA]." § 1681s2-(b)(1)(C). In other words, the CRA's "reasonable reinvestigation" consists largely of triggering the investigation by the furnisher. It would make little sense to deem the CRA's investigation "reasonable" if it consisted primarily of requesting a superficial, unreasonable investigation by the furnisher of the information.

**[4]** Nevertheless, MBNA urges that "Congress intended to impose a more rigorous duty of investigation on CRAs than on furnishers of information." But MBNA does not tell us why Congress would mandate shoddy or superficial furnisher investigations, not calculated to resolve or to explain the actual disagreement or to aid in the CRA's "reasonable reinvestigation." Indeed, as the statute recognizes, the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation. With respect to the accuracy of disputed information, the CRA is a third party, lacking any direct relationship with the consumer, and its responsibility is to "*re*investigate" a matter once already investigated in the first place. § 1681i(a)(1) (emphasis added). It would therefore make little sense to impose a more rigorous requirement on the CRAs than the furnishers. Instead, the more sensible conclusion is that, if anything, the "reasonable" qualifier attached to a CRA's duty to reinvestigate limits its obligations on account of its third-party status and the fact that it is repeating a task already completed once. Requiring furnishers, on inquiry by

a CRA, to conduct at least a reasonable, non-cursory investigation comports with the aim of the statute to "protect consumers from the transmission of inaccurate information about them." *Kates v. Crocker Nat'l Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985).

**[5]** We thus follow the Fourth and Seventh Circuits and hold that the furnisher's investigation pursuant to § 1681s-2(b)(1)(A) may not be unreasonable.

### b.   MBNA's Investigation was Reasonable

**[6]** As discussed, a furnisher's obligation to conduct a reasonable investigation under § 1681s-2(b)(1)(A) arises when it receives a notice of dispute from a CRA. Such notice must include "all relevant information regarding the dispute that the [CRA] has received from the consumer." § 1681i(a)(2)(A). It is from this notice that the furnisher learns the nature of the consumer's challenge to the reported debt, and it is the receipt of this notice that gives rise to the furnisher's obligation to conduct a reasonable investigation. The pertinent question is thus whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute.[11] *See Westra*, 409 F.3d at 827 ("[The furnisher's] investigation in this case was reasonable given the scant information it received regarding the nature of [the consumer's] dispute.").

MBNA received four notices of dispute regarding Gorman's account. Gorman argues that the district court erred in granting summary judgment as to the reasonableness of MBNA's investigation in response to these notices because triable issues of fact remain. We have held that "summary judgment is generally an inappropriate way to decide ques-

---

[11]In deciding that the notice determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken.

tions of reasonableness because 'the jury's unique compe-tence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment.' " *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 n.12 (1976)). However, summary judgment is not precluded altogether on questions of reasonableness. It is appropriate "when only one conclusion about the conduct's reasonableness is possible." *Id.* at 622; *see also Westra*, 409 F.3d at 827. We thus consider the sufficiency of MBNA's investigation with respect to each of the notices.

### i.   "Claims Company will Change"

**[7]** In a notice of dispute received May 13, 2004, Trans-Union provided the following information concerning Gor-man's MBNA account: "Claims company will change. Verify all account information." The notice provided no further information about the nature of the dispute. In response to this notice, MBNA "review[ed] the account notes to determine whether MBNA had agreed to delete any charges or to modify the account information in any way." It concluded that "[n]o such commitment had been made." MBNA's review of the account information provided by TransUnion did reveal "some minor differences." As a result, MBNA submitted updated address, date of birth, and account delinquency infor-mation to TransUnion.

**[8]** The cursory notation, "[c]laims company will change," provided no suggestion of the nature of Gorman's dispute with Four Peaks. We conclude therefore that a jury could not find MBNA's response unreasonable. MBNA reasonably read the vague notice as indicating that MBNA had previously agreed to change certain account information. MBNA's review of its internal account files to determine whether any such agreement had been reached was all that was required to respond reasonably to this notice of dispute. The account notes reveal that MBNA had communicated with Four Peaks

several times and do not reveal any agreement by MBNA to credit those charges, or any others. MBNA could not have reasonably been expected to undertake a more thorough investigation of the Four Peaks incident based on the scant information contained in this notice.

### ii.    "Fraudulent Charges"

MBNA received two notices disputing "fraudulent charges" on Gorman's account. A notice of dispute from Experian, dated May 18, 2004, stated: "Consumer claims account take-over fraudulent charges made on account. Verify Signature provide complete ID." In response to this notice, MBNA "verif[ied] that the name, address, date of birth and social security number reported by Experian matched the information that was contained in MBNA's records concerning the account." It also "review[ed] the account notes and check[ed] with the fraud department to determine whether there had ever been a fraud claim submitted with respect to the account." Because the identification information matched and no fraud claim had been submitted, MBNA reported to Experian that the information it previously reported was accurate and requested that Experian tell Gorman to contact MBNA if he suspected fraud.

MBNA received another dispute notice from TransUnion, dated November 29, 2005, that listed two disputes: (1) "Disputes present/previous Account Status History. Verify accordingly;" (2) "Consumer claims account take-over fraudulent charges made on account. Verify Signature provide or confirm complete ID." MBNA conducted the following inquiry:

> [V]erif[ied] that the account history that was being reported matched the account history data in MBNA's records, including the balance, the amount past due, the high credit and credit limit for the account. . . . [V]erif[ied] that the name, address, date of birth and social security number reported by

> TransUnion matched the information that was con-
> tained in MBNA's records concerning the
> account. . . . [R]eview[ed] the account notes and
> check[ed] with the fraud department to determine
> whether there had ever been a fraud claim submitted
> with respect to the account.

Because this investigation did not reveal that any information
was inaccurate, MBNA verified the information previously
submitted to TransUnion.

[9] Neither notice identified the nature of Gorman's dispute
as centering on the Four Peaks charge or indicated that the
dispute concerned rejection of the goods charged for. Indeed,
the notices did not describe the fraudulent transactions in any
detail; they were silent as to the approximate date of the
charges, their amount, and the identity of the merchant. More-
over, Gorman has never contended that the disputed charges
were initially unauthorized or were the result of identity theft,
as the dispute notices indicated. Not surprisingly, MBNA's
review of its internal account notes showed no evidence of
fraudulent activity, and all previous account data reported by
the CRAs matched MBNA's records. We conclude that, as in
the case of the first notice of dispute, MBNA could not rea-
sonably have been expected to investigate Gorman's chal-
lenge to the Four Peaks charge based on the vague and
inaccurate information it received from the CRAs in these
notices.[12]

_____

[12]Gorman complains that he had no control over the information the
CRAs gave MBNA, and that MBNA should have asked the CRAs for
more detail on Gorman's complaints. But Gorman's letters to the CRAs
do not provide much more detail concerning his dispute than the CRAs'
description to MBNA. Two of the dispute notices were prompted by let-
ters from Gorman to the CRAs stating:

> MBNA posted certain fraudulent credit card charges to a former
> VISA account in or about early 2003. I timely notified MBNA
> that the charges were disputed and should be removed from my

### iii.    "Promised Goods/Services Not Delivered"

One notice of dispute did provide more accurate and specific information relating to Gorman's dispute with MBNA. A December 2004 notice from Experian stated: "Claims inaccurate information. Did not provide specific dispute. Provide complete ID and verify account information." The notice further provided, in a section for "FCRA Relevant Information": "PROMISED GOODS/SERVICES NOT DELIVERED. I TIMELY DISPUTED THE CHARGES UNDER THE TIL ACT."[13] In response to this notice, MBNA

> review[ed] its records to confirm that all of the account information that was being reported by Experian matched MBNA's records. MBNA also reviewed the account notes to determine if any dispute submitted by Gorman concerning the account had been resolved in his favor. Since the reported information matched the information in MBNA's

account yet MBNA failed to removed [sic] them and is wrongfully claiming that my account is delinquent. No money is owed to MBNA. Moreover, MBNA has been repeatedly advised by me, both orally and in writing, that the debt is disputed but is unlawfully refusing to note the existence of the dispute on my credit record.

The November 2005 dispute notice was prompted by an on-line complaint form filled out by Gorman stating: "I have never made a late payment," and "Fraudulent charges were made on my account."

It is the duty of the CRA — not the furnisher — to ensure that the furnisher has all relevant information about the dispute. *See* § 1681i(a)(2)(A) (the CRA's notice to furnisher "shall include all relevant information regarding the dispute that the agency has received from the consumer . . . ."). Moreover, as it is not hard to see why the CRAs interpreted Gorman's messages as they did, MBNA likely would have interpreted them in the same way had it obtained them, and so would have made the same, limited investigation.

[13]This is likely referring to the Truth in Lending Act, Pub. L. No. 90-321, Title I, 82 Stat. 146 (1968) (codified at 15 U.S.C. § 1601 *et seq.*).

records, and because the prior investigation of the charge with Four Peaks Entertainment had not been resolved in favor of Gorman, MBNA verified all the information that it had reported about the account as accurate.

**[10]** Unlike the other three notices of dispute, the December 2004 notice contained enough information to alert MBNA to the specific nature of Gorman's actual claim: the reported debt was not owed because he had not received the goods he was promised. Simply verifying that the basic reported account data matched MBNA's internal records may not have been a reasonably sufficient investigation of this particular dispute.

But MBNA's investigation was more thorough than simply a review of bare account data. The review of internal records revealed that MBNA had previously investigated the Four Peaks charge and that the dispute had not been resolved in Gorman's favor.

Nevertheless, Gorman claims that a jury could still find MBNA's efforts unreasonable, because it failed to *re*investigate the dispute. As an initial matter, there is no evidence that MBNA's original investigation of the Four Peaks incident was deficient or unreliable.[14] MBNA contacted both Gorman and Four Peaks several times as part of the investigation. Its requests that Gorman provide more information were met with refusals to supply additional information or no response at all. MBNA's correspondence with Four Peaks also evidences a diligent attempt to ascertain the validity of the

---

[14]The reasonableness of MBNA's initial investigation is not directly before us. That investigation was conducted before MBNA reported Gorman's account to the CRAs. To the extent that it is governed by the FCRA at all, it falls under § 1681s-2(a)(1), the duty of furnishers to provide accurate information to CRAs. Although MBNA is required under § 1681s-2(a)(1) to provide accurate information, Gorman cannot enforce that obligation in a private cause of action. *See* § 1681s-2(c), (d).

charges. For example, MBNA asked about Goman's opportunity to return the merchandise and was told that Gorman received shipping labels to return the merchandise.

**[11]** Importantly, the CRA notice of dispute that triggered MBNA's duty to investigate did not identify any reason to doubt the veracity of the initial investigation. Furthermore, the notice of dispute did not provide any new information that would have prompted MBNA to supplement the initial investigation with any additional procedures or inquiries.

**[12]** We agree that "[w]hether a reinvestigation conducted by a furnisher in response to a consumer's notice of dispute is reasonable . . . depends in large part on . . . the allegations provided to the furnisher by the credit reporting agency." *Krajewski v. Am. Honda Fin. Corp.*, 557 F. Supp. 2d 596, 610 (E.D. Pa. 2008). Without any indication in the allegations that the initial investigation lacked reliability or that new information was available to discover, MBNA's decision not to repeat a previously-conducted investigation cannot have been unreasonable. Congress could not have intended to place a burden on furnishers continually to reinvestigate a particular transaction, without any new information or other reason to doubt the result of the earlier investigation, every time the consumer disputes again the transaction with a CRA because the investigation was not resolved in his favor. Thus, although reliance on a prior investigation *can* be unreasonable, *cf. Bruce v. First U.S.A. Bank, Nat'l Ass'n*, 103 F. Supp. 2d 1135, 1143-44 (E.D. Mo. 2000) (concluding that a furnisher's investigation was not necessarily reasonable when an initial investigation was deficient for, among other reasons, failing to contact the consumer), that was not the case here.

Gorman disputes this conclusion, insisting that under the Fourth Circuit's opinion in *Johnson*, it is per se unreasonable for a furnisher to rely solely on internal account records when investigating a consumer dispute. Gorman misreads *Johnson*, which recognized that the reasonableness of an investigation

depends on the facts of the particular case, most importantly the CRA's description of the dispute in its notice. *See Johnson*, 357 F.3d at 431 (noting that confining the investigation to internal computer notes was not necessarily reasonable *in light of* the specificity of the description of the dispute in the notice).

In *Johnson*, the CRA's notice to MBNA read: "CONSUMER STATES BELONGS TO HUSBAND ONLY;" "WAS NEVER A SIGNER ON ACCOUNT. WAS AN AUTHORIZED USER." *Id.* at 429. The underlying facts were that Johnson's future husband opened an MBNA credit card account. Some years later, after they were married, Johnson's husband filed for bankruptcy, and MBNA told Johnson she was responsible for the balance, maintaining that she was a co-applicant, and therefore a co-obligor, on the account. *Johnson*, 357 F.3d at 428-29. Johnson argued that she was merely an authorized user. *Id.*

In response to the notice to the CRAs, MBNA only confirmed Johnson's identifying information and confirmed that its internal computer system indicated she was the sole responsible party on the account. *Id.* at 431. At no time did MBNA try to ascertain whether Johnson's information — that she had not signed the application form — was correct. The Fourth Circuit held this investigation unreasonable:

> The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS [MBNA's internal computer system] and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS.

*Id.*

**[13]** In contrast to *Johnson*, in Gorman's case MBNA did review all the pertinent records in its possession, which revealed that an *initial* investigation had taken place in which MBNA contacted both Gorman and the merchant. Thus, unlike in *Johnson*, MBNA had — albeit earlier — gone outside its own records to investigate the allegations contained in the CRA notice, and on reading the notice, did consult the relevant information in its possession. *Johnson* does not indicate that a furnisher has an obligation to repeat an earlier investigation, the record of which is in the furnisher's records.

We emphasize that the requirement that furnishers investigate consumer disputes is procedural. An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate.

**[14]** In short, although "reasonableness" is generally a question for a finder of fact, summary judgment in this case was appropriate.

### 3. MBNA's failure to provide notice of dispute

Gorman next argues that MBNA failed to notify the CRAs that he continued to dispute the delinquent charges on his account. He contends that in reporting the delinquency without also reporting his ongoing dispute, MBNA violated its obligations under 12 C.F.R. § 226.13,[15] and thus furnished "incomplete or inaccurate" credit information in violation of

---

[15]This requirement is imposed by Regulation Z, promulgated pursuant to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. The regulation provides that, if a consumer timely disputes a charge with a creditor but the creditor concludes that the charge is valid, the creditor "[m]ay not report that an amount or account is delinquent because the amount due . . . remains unpaid, if the creditor receives [within a specific time period] further written notice from the consumer that any portion of the billing error is still in dispute, unless the creditor also . . . [p]romptly reports that the amount or account is in dispute." 12 C.F.R. § 226.13(g)(4).

the FCRA. MBNA neither concedes nor disputes that it was so obligated,[16] but argues on summary judgment that the statute does not permit Gorman to raise this claim. Also, in the alternative, MBNA contends that Gorman did not submit enough evidence to show whether his credit reports included a notice that the delinquency was disputed or whether MBNA did not so notify the CRAs. We must decide (1) whether the failure to notify the CRAs that the delinquent debt was disputed is actionable under § 1681s-2(b), and if so, (2) whether Gorman introduced sufficient evidence on summary judgment to show that MBNA so notified the CRAs.

### a.   Gorman's Claim is Actionable

**[15]** If a consumer disputes the accuracy of credit information, the FCRA requires furnishers to report that fact when reporting the disputed information. Section 1681s-2(a)(3) provides: "If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer." As noted, however, the statute expressly provides that a claim for violation of this requirement can be pursued only by federal or state officials, and not by a private party. § 1681s-2(c)(1) ("Except [for circumstances not relevant here], sections 1681n and 1681o of this title [providing private right of action for willful and negligent violations] do not apply to any violation of . . . subsection (a) of this section, including any regulations issued thereunder."); *see also Nelson*, 282 F.3d at 1059. Thus, Gorman has no private right of action under § 1681s-2(a)(3) to proceed against MBNA for its initial failure to notify the CRAs that he disputed the Four Peaks charges.

---

[16]Gorman does not bring a claim under either Regulation Z or the pertinent section of the Truth in Lending Act. We therefore need not decide whether in this case MBNA violated its obligations under those provisions.

**[16]** Gorman does have a private right of action, however, to challenge MBNA's subsequent failure to so notify the CRAs after receiving notice of Gorman's dispute under § 1681s-2(b). In addition to requiring that a furnisher conduct a reasonable investigation of a consumer dispute, § 1681s-2(b) also requires a creditor, upon receiving notice of such dispute, to both report the results of the investigation *and*, "if the investigation finds that the information is incomplete or inaccurate, report those results" to the CRAs. § 1681s-2(b)(1)(C), (D). Gorman argues that MBNA's reporting of the Four Peaks charge and delinquency, without a notation that the debt was disputed, was an "incomplete or inaccurate" entry on his credit file that MBNA failed to correct after its investigation. As this claim alleges that obligations imposed under § 1681s-2(b) were violated, it is available to private individuals.

**[17]** The Fourth Circuit has recently held that after receiving notice of dispute, a furnisher's decision to continue reporting a disputed debt without any notation of the dispute presents a cognizable claim under § 1681s-2(b). *See Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008). In *Saunders*, a consumer alleged that he incurred late fees and penalties as a result of a creditor's own admitted accounting errors; the creditor, Branch Banking & Trust (BB&T), refused to waive the fees, and the consumer responded by withholding payments on the loan. *Id.* at 145-46. BB&T reported the loan to the CRAs as "in repossession status," and, after suffering adverse credit decisions, the consumer contacted the CRAs to report the dispute. *Id.* at 146. The CRAs sent a notice of dispute to BB&T, triggering its obligations to investigate and verify the accuracy of the reported information under § 1681s-2(b)(1). BB&T responded by updating the consumer record to reflect that it had written off the debt as uncollectible, but failed to indicate that the consumer still disputed the validity of the obligation. *Id.* The consumer brought suit under § 1681s-2(b) and a jury found that BB&T had violated its obligations.

The Fourth Circuit affirmed. The court reasoned that in enacting § 1681s-2(b)(1)(D), "Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading." *Id.* at 148. Although the report may have been "technically accurate" in the sense that it reflected the consumer's failure to make any payments on the loan, the court noted that it had previously held that "a consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression." *Id.* (citing *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415-16 (4th Cir. 2001)). The Fourth Circuit went on to note that a consumer's failure to pay a debt that is not really due "does not reflect financial irresponsibility," and thus the omission of the disputed nature of a debt could render the information sufficiently misleading so as to be "incomplete or inaccurate" within the meaning of the statute. *Id.* at 150. *Saunders* went on to reject the contention that Congress meant to exempt furnishers of information from private liability by placing the initial obligation to report disputes in subsection (a), stating that "[n]o court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s-2(b) by arguing that it should have *already* reported the information accurately under § 1681s-2(a)." *Id.* at 149-50.

**[18]** This reasoning is persuasive. Like *Saunders*, several other courts have held that a credit entry can be "incomplete or inaccurate" within the meaning of the FCRA "because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998); *see also Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C. Cir. 1984) ("Certainly reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer . . . ."). As the Fourth Circuit

observed, holding otherwise would create a rule that, as a matter of law, an omission of the disputed nature of a debt never renders a report incomplete or inaccurate. *See Saunders*, 526 F.3d at 150. Not only might such a rule intimidate consumers into giving up bona fide disputes by paying debts not actually due to avoid damage to their credit ratings, but it also contravenes the purpose of the FCRA, to protect against "unfair credit reporting methods." *See* 15 U.S.C. § 1681(a)(1).

Holding that there is a private cause of action under § 1681s-2(b) does not mean that a furnisher could be held liable on the merits simply for a failure to report that a debt is disputed. The consumer must still convince the finder of fact that the omission of the dispute was "misleading in such a way and to such an extent that [it] can be expected to have an adverse effect." *Saunders*, 526 F.3d at 150 (quotation omitted). In other words, a furnisher does not report "incomplete or inaccurate" information within the meaning of § 1681s-2(b) simply by failing to report a meritless dispute, because reporting an actual debt without noting that it is disputed is unlikely to be materially misleading. It is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b). *Cf. id.* at 151 ("[W]e assume, without deciding that a furnisher incurs liability under § 1681s-2(b) only if it fails to report a meritorious dispute.").

**[19]** It is true, as we have said, that a furnisher's initial failure to comply with this requirement is not privately enforceable. But as the Fourth Circuit noted, this does not excuse the furnisher's failure to correct the omission after investigating pursuant to § 1681s-2(b). *See Saunders*, 526 F.3d at 150. The purpose of § 1681s-2(b) is to require furnishers to investigate and verify that they are in fact reporting complete and accurate information to the CRAs after a consumer has objected to the information in his file. *See Johnson*, 357 F.3d at 431 ("[Congress] create[d] a system intended to give consumers a means to dispute—and, ultimately, correct—inaccurate infor-

mation on their credit reports."). A disputed credit file that lacks a notation of dispute may well be "incomplete or inaccurate" within the meaning of the FCRA, and the furnisher has a privately enforceable obligation to correct the information after notice. § 1681s-2(b)(1)(D). We thus conclude that the statute permits Gorman to bring his claim regarding MBNA's failure to report the charge still disputed.

### b.    Evidentiary Challenges

MBNA argues that summary judgment is nevertheless appropriate on this claim because Gorman failed to introduce sufficient admissible evidence that (1) his credit reports lacked a notation that the Four Peaks debt was disputed and (2) MBNA failed to report the account as disputed in this respect to the CRAs.

Gorman did not submit his credit reports to the district court until after the court issued its summary judgment order.[17] We ordinarily will not consider on appeal "[p]apers submitted to the district court *after* the ruling that is challenged." *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988). We need not decide, however, whether the credit reports are properly before us, because Gorman has submitted other admissible evidence that creates a triable issue of fact as to whether his credit reports lacked a notice of dispute.

**[20]** Gorman previously stated in his declaration that he had reviewed many of his personal credit reports, and that none of them included a notice that he disputed the delinquent charges. This statement is admissible evidence. Gorman has personal knowledge, having seen the reports. The evidence is not inadmissible hearsay, as Gorman does not rely on the credit reports for the truth of the matter asserted therein; in fact, as he notes, he disputes the truth of their contents.

---

[17]Gorman submitted the credit reports in support of his motion for leave to file a motion for reconsideration.

Instead, Gorman offers them to prove that no statement noticing the dispute was made. "If the significance of an offered statement lies solely in the fact that it was made . . . the statement is not hearsay." *United States v. Dorsey*, 418 F.3d 1038, 1044 (9th Cir. 2005) (quoting Fed. R. Evid. 801 advisory committee's note). He thus submitted sufficient evidence for a jury to conclude that his credit reports contained no notice of dispute.

**[21]** There is also sufficient evidence from which a jury could infer that MBNA did not notify the CRAs that the debt was disputed. Gorman himself has no personal knowledge of what MBNA actually submitted to the CRAs in response to its investigations.[18] However, the dispute verification forms MBNA returned to the CRAs contained no notice that the debt was disputed; rather, they indicated that the information previously provided was "accurate as reported." Yet, MBNA's review of Gorman's account notes revealed that he continued to dispute the debt even after MBNA concluded its initial investigation and reposted the Four Peaks charges. Moreover, according to MBNA's witness's declaration, MBNA told the CRAs that all of the information reported on Gorman's account was accurate, and Gorman has produced sufficient evidence that no notice of dispute appeared on the credit reports. Gorman has thus submitted sufficient evidence to create an issue of fact concerning whether MBNA failed to inform the CRAs, in response to the dispute notice, that Gorman still disputed the debt.

**[22]** In sum, we hold that any investigation under § 1681s-2(b)(1)(A) must be reasonable; that any reasonable trier of fact would conclude that MBNA's investigation was reason-

---

[18]The only evidence he submitted was his sworn declaration that MBNA "report[ed] my account as delinquent *without indicating that some or all of the debt was disputed by the account holder*." Gorman Decl. ¶ 12, Apr. 12, 2006. But Gorman provided no indication that he had personal knowledge of the contents of MBNA's report.

able; that § 1681s-2(b) permits Gorman to bring his claim that MBNA failed to inform the CRAs that the information about his delinquency was "incomplete or inaccurate" after investigating the December 2004 notice from the CRAs; and that Gorman has submitted sufficient evidence to survive summary judgment on this claim.[19]

## B.   Libel Claim

Gorman also advanced a state law libel claim on which the district court made two rulings. On MBNA's motion to dismiss, the court held that the FCRA did not preempt Gorman's libel claim because he alleged malice or willful intent to injure, satisfying the requirements of § 1681h(e). *Gorman I*, 370 F. Supp. 2d at 1009-10. MBNA contests this conclusion. The district court granted MBNA's motion for summary judgment on the libel claim however, holding that Gorman failed to submit evidence creating a disputed issue of material fact with respect to malice or willful intent. *Gorman II*, 435 F. Supp. 2d at 1009-10. Gorman appeals this ruling.

## 1.   Preemption

The preemption question presents a difficult issue of first impression. The difficulty arises from the interaction of two provisions of the FCRA. Section 1681h governs the "[c]onditions and form of disclosure to consumers," disclosures that CRAs are required or permitted to make under other

---

[19]Because the district court held that there was no private right of action under § 1681s-2(b), it did not reach the merits of Gorman's claim. *Gorman II*, 435 F. Supp. 2d at 1008-09. On appeal, MBNA's arguments as to this claim are only that there is no private right of action, and, in the alternative, that Gorman has failed to introduce admissible evidence that MBNA failed to report the debt as disputed. We do not go beyond the arguments made, and so conclude only that Gorman can go forward with his claim, having produced admissible evidence that MBNA failed to report the debt as disputed. We take no position as to whether MBNA's failure to report the debt as disputed violated § 1681s-2(b).

sections of the Act. Section 1681h(e) sets forth, in relevant part, the following "[l]imitation of liability" (with emphasis added):

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g,[20] 1681h,[21] or 1681m[22] of this title or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report *except as to false information furnished with malice or willful intent to injure such consumer*

Section 1681t addresses more generally the FCRA's "[r]elation to State laws." In general, the FCRA does not preempt any state law "except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency." § 1681t(a). But this general rule has several exceptions, added in 1996, including the following:

---

[20]Section 1681g addresses "[d]isclosures to consumers." It provides in detail the information CRAs must disclose to consumers, the rights of consumers to obtain credit reports and scores and to dispute information in credit reports, and the information that must be made available to identity theft victims and mortgage applicants.

[21]Section 1681h, as noted above, deals with the "[c]onditions and form" of these disclosures.

[22]Section 1681m addresses the duties of "users of consumer reports." In essence, it imposes certain responsibilities on persons who take adverse actions based on credit reports or another source of information about a person's credit, or who make solicitations on the basis of credit reports.

> No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—
>
>> (i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or
>>
>> (ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996).

§ 1681t(b)(1)(F).[23] No changes were made to § 1681h(e) with these amendments.

Although § 1681t(b)(1)(F) appears to preempt all state law claims based on a creditor's responsibilities under § 1681s-2,

---

[23]The parties assume that, if § 1681t(b)(1)(F) applies, it bars Gorman's libel claim. We note, however, that the application of that section to any given common law claim is not self-evident. In *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), the Supreme Court discussed whether a preemption provision containing the same "No requirement or prohibition . . . shall be imposed" language applied to some, but not all, common law claims. A plurality of the Court analyzed the question as follows: "we ask whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion,' giving that clause a fair but narrow reading." *Id.* at 523-24 (alterations in original). *See also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (applying a " 'presumption against the pre-emption of state police power regulations' to support a narrow interpretation of such an express [statutory] command."). Assuming this is the right inquiry, libel law probably entails a "prohibition . . . with respect to" what a furnisher of information can report to a CRA. We do not decide the question, however, given our conclusion that Gorman has not presented sufficient evidence to state a libel claim.

§ 1681h(e) suggests that defamation claims can proceed against creditors as long as the plaintiff alleges falsity and malice. Attempting to reconcile the two sections has left district courts in disarray. The district court in this case held that § 1681h(e), the more specific preemption provision, trumped the more general preemption provision of § 1681t(b)(1)(F).[24] *Gorman I*, 370 F. Supp. 2d at 1009-10 (citing *Gordon v. Greenpoint Credit*, 266 F. Supp. 2d 1007, 1013 (S.D. Iowa 2003)). Other district courts have followed different approaches. Some have concluded that the later-enacted § 1681t(b)(1)(F) effectively repeals the earlier preemption provision, § 1681h(e). *Jaramillo v. Experian Info. Solutions, Inc.*, 155 F. Supp. 2d 356, 361 (E.D. Pa. 2001) (footnote omitted) (the "total preemption" approach). Attempting to give meaning to both sections, other courts have observed that § 1681t(b)(1)(F) relates to "any subject matter regulated under section 1681s-2," the section which regulates the responses of furnishers to notices of dispute. Hence, these courts apply a "temporal approach," holding that "causes of action predicated on acts that occurred *before* a furnisher of information had notice of any inaccuracies are not preempted by § 1681t(b)(1)(F), but are instead governed by § 1681h(e)." *Kane v. Guar. Residential Lending, Inc.*, 2005 WL 1153623, at *8 (E.D.N.Y. May 16, 2005).

Gorman advocates a still different "statutory" analysis, under which "t(b)(1)(F) preempts only state law claims against credit information furnishers brought under state statutes, just as 1681h(e) preempts only state tort claims." *Manno v. Am. Gen. Fin. Co.*, 439 F. Supp. 2d 418, 425 (E.D. Pa.

---

[24]We note that both provisions are specific in different ways: § 1681t(b)(1)(F) is specific as to the target of suits, governing requirements placed on furnishers of information; § 1681h(e) is specific as to the nature of the claim, permitting certain common law claims if falsity and malice is shown. So, in some sense, both provisions are "specific." But § 1681h(e) may be more specific for preemption purposes, because the tension is the nature of the claims preempted, and § 1681h(e) specifies certain claims that can be brought.

2006) (describing the approach).[25] Finally, MBNA argues that § 1681h(e) is not a broad preemption provision at all, but simply a "grant of protection for statutorily required disclosures." (quoting *McAnly v. Middleton & Reutlinger, P.S.C.*, 77 F. Supp. 2d 810, 814 (W.D. Ky. 1999)). But, of course, granting entities immunity from state law tort suits in exchange for making required disclosures is just another way of saying that certain state law claims are preempted.[26]

In the end, we need not decide this issue. As we conclude below, even if Gorman could bring a state law libel claim under § 1681h(e), and such a claim were not preempted by § 1681t(b)(1)(F), he has not introduced sufficient evidence to survive summary judgment on this claim.

---

[25]Support for this view rests on the proposition that "Congress seems to have been most concerned with protecting credit information furnishers from state statutory obligations inconsistent with their duties under the FCRA." *Manno*, 439 F. Supp. 2d at 425. Section 1681t(b)(1)(F) exempts two specific state statutes from preemption, suggesting, some courts say, that Congress "had state statutes in mind." *Id.* Other subsections of § 1681t also exempt state statutes; none addresses common law claims. Yet, this distinction does not appear in the text of the statute. In fact, "[t]he phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules." *Cipollone*, 505 U.S. at 521 (1992) (plurality opinion) (second alteration in original); *see also Riegel v. Medtronic, Inc.*, 128 S.Ct. 999, 1008 (2008) (adopting this position for a majority of the Court).

[26]*McAnly* offers one reason why Congress may have chosen to preempt such state law claims:

> Since various parts of the federal statute require consumer reporting agencies and information users to disclose information to consumers under certain circumstances, this section guarantees that the agencies or users cannot be sued for those required disclosures under state tort law. It makes sense that acts required to be done by the FCRA are immunized from state tort liability.

77 F. Supp. 2d at 814-15. However illuminating this explanation may be, it does not help resolve the apparent conflict between §§ 1681h(e) and 1681t(b)(1)(F).

## 2.  Evidence

**[23]** Under California law, "[l]ibel is a false and unprivileged publication . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45. Even if Gorman's libel claim is not preempted by § 1681t(b)(1)(F), it is still subject to § 1681h(e), and so he must prove, in addition to the common law elements of libel, that the information was "false" and "furnished with malice or willful intent to injure."

**[24]** The FCRA does not define the appropriate standard for "malice." The two circuits that have interpreted § 1681h(e) have applied the standard enunciated in *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964), requiring the publication be made "with knowledge that it was false or with reckless disregard of whether it was false or not." *See Morris v. Equifax Info. Servs., LLC*, 457 F.3d 460, 471 (5th Cir. 2006); *Thornton v. Equifax, Inc.*, 619 F.2d 700, 705 (8th Cir. 1980). Under *New York Times*, to show "reckless disregard," a plaintiff must put forth "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Morris*, 457 F.3d at 471 (applying *St. Amant*). We agree with the courts that have adopted the *New York Times* standard for purposes of § 1681h(e), and so apply it here.

Gorman's libel claim is based on two pieces of information reported by MBNA: the underlying debt itself and the reporting of the debt without a notation that it was disputed.

As to the debt itself, there is no evidence that MBNA knew the debt was false or acted with reckless disregard as to its falsity. As an initial matter, the bulk of the delinquent debt — about $5,000 — derives from non-disputed credit card purchases, unrelated to the disputed Four Peaks charge. Gorman

contends that he does not owe these charges, claiming an off-set for his attorneys' fees incurred in the dispute over the Four Peaks debt. But he has presented no authority whatever supporting his entitlement to these fees, nor any evidence that these fees are reasonable. Absent any evidence or colorable argument that this portion of the debt to MBNA was invalid, no reasonable jury could find that MBNA acted maliciously in reporting this portion of the debt to the CRAs.

Gorman has also failed to introduce sufficient evidence of malice with respect to the remaining portion of the debt, the roughly $750 disputed Four Peaks charge. Even assuming that the debt was indeed invalid, we cannot say that a reasonable jury could conclude that MBNA acted with "reckless disregard" as to the invalidity of the debt.[27]

MBNA conducted an investigation into Gorman's dispute in which it contacted both Gorman and Four Peaks. As a result of the investigation, it initially agreed to remove the charges, reinstating them only after learning that Gorman had failed to return the merchandise. The remaining controversy involves a legal and factual disagreement between Gorman and Four Peaks.[28] MBNA did not act recklessly by failing to wade through this complex legal and factual debate. *See Bloom v. I.C. Sys., Inc.*, 972 F.2d 1067, 1069 (9th Cir. 1992)

---

[27]We do not decide whether the debt related to the Four Peaks charge is valid, as the question is not before us.

[28]Gorman's essential claim is that in rejecting the goods and making them available to Four Peaks for pickup, he has done all that is required under California law. *See* Cal. Com. Code § 2602 ("If the buyer has before rejection taken physical possession of the goods . . . he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them."). Four Peaks claimed to have sent Gorman pre-paid shipping labels for the defective merchandise's return, but insisted that Gorman would have to pay to return the replacement equipment it claims to have sent. Gorman insists that he did not receive any replacement merchandise or shipment labels and, in any event, he refuses to pay any shipping costs.

(concluding that a furnisher does not act with malice when it takes "reasonable steps to verify the information" in its credit report). That it reposted the debt in reliance on Four Peaks's version rather than resolving the dispute in Gorman's favor does not demonstrate that MBNA "entertained serious doubts as to the truth of [its] publication." *St. Amant*, 390 U.S. at 731.

Additionally, even if MBNA violated its obligations to report that Gorman disputed the debt, this failure does not render the information that was reported "false" so as to support a libel claim meeting the § 1681h(e) malice standard. The obligation to report a disputed debt is a protective regulatory requirement imposed by the FCRA. § 1681s-2(a)(3); *see also* 12 C.F.R. § 226.13. Any failure by MBNA to meet this requirement may render its reporting deficient under the statute, but it does not render the information MBNA did furnish maliciously or wilfully false. So long as the creditor has a good faith reason for believing that the debt is in fact owed, reporting the debt without reporting the dispute does not convey "false" information "with malice or willful intent to injure the consumer." *See Francis v. Dun & Bradstreet, Inc.*, 4 Cal. Rptr. 2d 361, 364 (Ct. App. 1992) (holding that a defamation claim cannot be sustained for truthful information in a credit report, even if the information reported supports misleading inferences).

Gorman has offered no evidence that MBNA seriously doubted that the debt was owed, or that MBNA believed Gorman had a meritorious dispute. The record suggests instead that MBNA investigated the debt and determined that it was valid. Despite its conclusion, MBNA may still have faced a regulatory obligation to report the continuing dispute, but its failure to do so was not malicious.

[25] Gorman's sole evidence of MBNA's malice or intent to injure is the statement in his declaration that an MBNA representative told him, during a collection call, "We're a big bank. You either pay us or we'll destroy your credit." But this

incident does not evidence a knowledge on MBNA's part that the debt was not valid. In the context of other evidence in the record — including Gorman's refusal to pay *any* of his credit card bill because of supposed attorneys' fees owed him by MBNA — there is no basis for concluding that MBNA issued that threat knowing no debt was due or recklessly disregarding the invalidity of the debt.

**[26]** As Gorman cannot state a claim for libel consistent with the *limited* exception contained in § 1681h(e) of the FCRA, we affirm the district court's grant of summary judgment to MBNA on Gorman's libel claim.

## C.     California Civil Code § 1785.25(a)

**[27]** Finally, Gorman brings a claim under California Civil Code section 1785.25(a), which provides:

> A person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate.

Section 1681t(b)(1)(F), the FCRA's preemption provision, expressly exempts *this subsection* — California Civil Code section 1785.25(a) — from its general exclusion of state law claims on matters governed by § 1681s-2.[29]

---

[29]As noted above, § 1681t(b)(1)(F) provides:

> No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—
>
> > (i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or
> >
> > (ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996).

The Massachusetts statute sets forth procedures to ensure accuracy of information reported to consumer reporting agencies.

On MBNA's motion to dismiss, the district court nevertheless held the California statutory claim preempted, because the private right of action to enforce California Civil Code section 1785.25(a) is found in other sections not specifically exempted from the federal preemption provision, namely, California Civil Code sections 1785.25(g)[30] and 1785.31.[31] Because these specific sections were not excluded from the preemption section of the FCRA, the district court concluded, violations of California Civil Code section 1785.25(a) could only be enforced by federal or state officials. *Gorman I*, 370 F. Supp. 2d at 1010-11.

We do not find the district court's reasoning persuasive. As an initial matter, the court did not cite any provision of California law authorizing enforcement of section 1785.25(a) by state officials. *Lin v. Universal Card Services Corp.*, 238 F. Supp. 2d 1147 (N.D. Cal. 2002), on which the district court relied, similarly fails to identify authorization for enforcement by state officials. Such authorization may reside elsewhere in California law, but if it does, it almost surely lies in provisions also not specifically excluded by the FCRA preemption provision. The district court's analysis would thus lead to the conclusion that Congress explicitly retained the portions of the California statutory scheme that create obligations, without leaving in place any enforcement mechanism. This would be an unlikely result at best.[32]

---

[30]Section 1785.25(g) provides:

> A person who furnishes information to a consumer credit reporting agency is liable for failure to comply with this section, unless the furnisher establishes by a preponderance of the evidence that, at the time of the failure to comply with this section, the furnisher maintained reasonable procedures to comply with those provisions.

[31]Section 1785.31 provides that "[a]ny consumer who suffers damages as a result of a violation of this title by any person may bring an action" to recover damages.

[32]In *Islam v. Option One Mortgage Corp.*, 432 F. Supp. 2d 181 (D. Mass. 2006), the court examined the Massachusetts provision, Mass. Gen.

**[28]** Moreover, the district court construed the statutory exception in isolation, disregarding the affirmative preemption language of the statute that "*[n]o requirement or prohibition* may be imposed" with respect to subjects regulated under § 1681s-2. (emphasis added). Neither California Civil Code section 1785.25(g) nor section 1785.31 imposes a "requirement or prohibition." Rather, these sections merely provide a vehicle for private parties to enforce other sections, which *do* impose requirements and prohibitions. In other words, Congress had no need to include these enforcement provisions in the § 1681t(b)(1)(F) exception to save the California statutory scheme from preemption, because those provisions were not preempted by the affirmative language of the preemption provision. By the plain language of the statute, therefore, these sections are not preempted by § 1681t(b)(1)(F).

MBNA argues that this plain reading of the statute is foreclosed by the Supreme Court's decision in *Cipollone*. Interpreting the phrase "any requirement or prohibition" in the Federal Cigarette Label and Advertising Act, a majority of the *Cipollone* Court held that common law damages actions can

Law 93 § 54A(a), that is also excluded from § 1681t(b)(1)(F). As with the California statute, the FCRA explicitly identifies the portion of the Massachusetts statute that creates the reporting obligations for furnishers, but does not expressly mention the section that provides for private enforcement. *Id.* at 185-86. The court held that absent any evidence that state officials were authorized to enforce this provision, the construction urged by the district court here could not stand: "it is absurd to conclude that Congress would have explicitly excepted [Mass. Gen. Law 93 § 54A(a)] while not leaving an enforcement mechanism." *Id.* at 189. Finding that the parties stipulated to the Attorney General's authority, however, *Islam* held the private state claim preempted. *Id.*

The *Islam* court also felt itself constrained by the First Circuit's affirmance of *Gibbs v. SLM Corp.*, 336 F. Supp. 2d 1 (D. Mass. 2004), *aff'd*, *Gibbs v. SLM Corp.*, No. 05-1057, 2005 WL 5493113 (1st Cir. Aug. 23, 2005), which also construed § 1681t(b)(1)(F) as preempting private causes of action under the Massachusetts statute, and was summarily affirmed by the First Circuit without analysis. As we engage in more thorough statutory construction analysis, we reach a different conclusion.

impose "requirement[s] or prohibition[s]," because "regulation can be as effectively exerted through an award of damages as through some form of preventive relief." 505 U.S. at 521 (plurality opinion) (citation omitted).[33] But, as the court later made clear in a majority opinion relying on the *Cipollone* plurality's discussion on this point, it is not the common law *enforcement mechanisms* that are requirements or prohibitions, but the "common law *duties*" underlying such actions. *Riegel v. Medtronic, Inc.*, 128 S.Ct. 999, 1008 (2008) (emphasis added). As *Riegel* went on to explain, again relying on the *Cipollone* plurality, "common-law liability is premised on the existence of a *legal duty*, and a tort judgment therefore establishes that a defendant has violated a state-law *obligation*." *Id.* (quoting *Cipollone*, 505 U.S. at 522) (emphasis added). Thus, a "requirement" is "a rule of law that must be obeyed," *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005), whether it arises from common law principles enforceable in damages actions or in a statute. But the damages remedy itself is not a "requirement or prohibition."

Here, it is California Civil Code section 1785.25(a), and only section 1785.25(a), that imposes legal duties — "rule[s] of law that must be obeyed" — on furnishers of information. Congress explicitly saved this section from preemption in the FCRA. Private enforcement of these obligations does not impose "requirement[s] or prohibition[s]" but, instead, provides enforcement mechanisms for "requirement[s] or prohibition[s] imposed separately. Sections 1785.25(g) and 1785.31 do not impose any additional standards "designed to be . . . potent method[s] of governing conduct and controlling policy," *Riegel*, 128 S.Ct. at 1008, nor do these sections

---

[33]Although only a plurality of the Court signed onto the portion of the opinion containing this specific language, a majority of justices adopted the position that the language "requirement or prohibition" sweeps broadly enough to encompass state common-law rules. *See Cipollone*, 505 U.S. at 548-49 (Scalia and Thomas, JJ., concurring in the judgment in part and dissenting in part).

require furnishers to obey any *additional* rules of law. The rules that must be obeyed already exist in the reporting obligations specified by section 1785.25(a) and saved in the FCRA. *See Bates*, 544 U.S. at 445.

MBNA's argument that Congress's desire for uniformity and consistency compels an alternative construction is also unpersuasive in this context. MBNA maintains that the FCRA preemption provision evidences a desire for uniform credit reporting obligations, and that the California statute was saved only because it was not inconsistent with obligations imposed by the federal statute. The legislative history surrounding § 1681t(b)(1)(F) is murky, but there is evidence that the statutory scheme, which establishes national requirements and preempts most state regulation, was motivated at least in part by a desire for uniformity of reporting obligations. *See* S. Rep. No. 103-209, at 7 (1993) ("Recognizing the national scope of the consumer reporting industry and the benefits of uniformity, the Committee bill includes provisions preempting state law in several key areas of the FCRA."). It is also true that the excepted state law provisions are largely consistent with obligations imposed in the FCRA; indeed, the requirements imposed in the California and Massachusetts laws appear, in nearly identical fashion, in § 1681s-2(a).[34]

---

[34]*Compare* Cal. Civ. Code section 1785.25(a) ("A person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate."), *and* Mass. Gen. Law 93 § 54A(a) ("Every person who furnishes information to a consumer reporting agency shall follow reasonable procedures to ensure that the information reported to a consumer reporting agency is accurate and complete. No person may provide information to a consumer reporting agency if such person knows or has reasonable cause to believe such information is not accurate or complete."), *with* § 1681s-2(a)(1)(A) ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.").

As MBNA indicates, when the California exception was added in 1996, the relevant portion of the FCRA was worded differently. *See* 15 U.S.C.

But the difference between the California statute and the FCRA regarding remedies does not offend the purported goal of uniformity of credit reporting obligations. The enforcement sections do not impose inconsistent or conflicting obligations on furnishers of information; as we have noted, they impose *no* such requirements or prohibitions at all. As such, the enforcement provisions do not add to a patchwork of confusing obligations with which a furnisher must struggle to comply. They instead allow for additional avenues through which consumers can ensure that furnishers are complying with the obligations Congress specifically meant to impose.

Moreover, exempting specific state statutes from preemption is very unusual in federal statutes. To suppose Congress would do so for little or no purpose — as would be the case if the private cause of action under California law were preempted — is simply not plausible. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000) ("The saving clause assumes that there are some significant number of . . . cases to save.").

**[29]** Because the plain language of the preemption provision does not apply to private rights of action, and because the likely purpose of the express exclusion was precisely to permit private enforcement of these provisions, we hold that the

§ 1681s-2(a)(1)(A) (1996) (prohibiting furnishing of information that furnisher "knows or consciously avoids knowing" is inaccurate). Congress later amended the FCRA to more closely track the language of the California statute. MBNA argues that it was originally reasonable for Congress expressly to exclude the California statute from preemption simply because it imposed broader, and potentially inconsistent, obligations on furnishers. Although this may be true, when Congress later amended the FCRA essentially to match the California statute, it did not then remove the California exception, as it could have done. The decision to retain the exception for California Civil Code section 1785.25(a) thus suggests that Congress likely intended to preserve the remaining unique provisions of the California scheme, including the private enforcement provisions.

private right of action to enforce California Civil Code section 1785.25(a) is not preempted by the FCRA.[35]

---

[35]On petition for rehearing en banc, MBNA raises for the first time an argument that allowing private enforcement of California Civil Code section 1785.25(a) is inconsistent with the purpose of the FCRA and thus is preempted under both FCRA § 1681t(a) and ordinary conflict preemption provisions. MBNA did not advance this contention before us initially, so the argument is waived. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

Even if we were to entertain MBNA's conflict preemption argument, however, we would reject it for several reasons. First, a complete reading of the statutory language continues to convince us that Congress intended to except the California statute—including the private enforcement provisions—from preemption. As we note, the remedial provisions do not impose any "requirement[s] or prohibition[s]" on furnishers of information as those terms are ordinarily understood, and so the private enforcement provisions do not fall within the statute's express preemption provision. Even more importantly, the savings provision, § 1681t(b)(1)(F)(ii), provides that FCRA's preemption provisions do not apply "with respect to" California Civil Code section 1785.25(a). Unlike other state laws expressly saved by the exceptions to the express preemption provision, which, for example, state that the FCRA "shall not apply *to* any State law in effect on September 30, 1996," *see* § 1681t(b)(1)(E) (emphasis added), Congress used the broader "with respect to" language to refer to the California statute.

The most sensible understanding of this difference is that Congress intended for the exception to apply not only to the specific subsection mentioned in the statute, but also to California laws that operate "with respect to" that subsection, which would include the private enforcement sections. Where Congress saves a particular state law from preemption, it would be incoherent to hold that the state law is otherwise preempted because it was somehow "inconsistent" with an overarching congressional purpose.

Second, MBNA directs us to FCRA § 1681s(c) to support its contention that the FCRA preserves state law enforcement officials' powers to enforce California Civil Code section 1785.25(a).

Section 1681s(c) provides, in relevant part, "In addition to other remedies as are provided under State law, if the chief law enforcement officer of a State . . . has reason to believe that any person has violated or is violating this subchapter, the State [may bring actions to enjoin the violation and recover damages]."

### D.    Evidence of Causation/Damages

Finally, MBNA proposes an alternative ground on which to affirm all claims: that Gorman failed in the summary judgment proceedings to submit admissible evidence of causation or damages. In *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069-70 (9th Cir. 2008), this court found sufficient evidence of causation and damages to survive summary judgment where:

> Dennis [the plaintiff] testified that he hoped to start a business and that he diligently paid his bills on time for years so that he would have a clean credit history when he sought financing for the venture. The only blemish on his credit report in April 2003 was the erroneously reported judgment. According

---

We think this provision supports, rather than undermines, the position that the FCRA does not preempt private enforcement of the California statute. If anything, section 1681s(c) provides authorization for state officials to enforce violations of the *FCRA*, while at the same time *preserving* "other remedies as are provided under State law," including private enforcement remedies for state law violations: Importantly, section 1681s(c) does not refer to "other remedies as are provided to chief law enforcement officers under State law." In other words, to the extent that Congress saved a state liability rule from preemption, it intended also to save "other remedies as are provided under State law" to enforce those liability rules.

Third, the available legislative history and administrative interpretation of the FCRA supports our holding concerning the scope of the FCRA preemption provisions. The Senate report concluded that "no State law would be preempted [by the FCRA] unless compliance would involve a violation of Federal law." S. Rep. No. 97-517, at 12 (1969). The Federal Trade Commission, charged with enforcing the FCRA, similarly understands the "basic rule" governing preemption under the FCRA: Section 1681t(a) preempts state law "only when compliance with inconsistent state law would result in a violation of the FCRA." 16 C.F.R. pt. 600 appx. § 622 ¶ 1. As we note, permitting private enforcement of state law obligations that are nearly identical to the FCRA's obligations would not require furnishers to violate the FCRA to comply with state law.

to Dennis, that was enough to cause several lenders to decline his applications for credit, dashing his hopes of starting a new business. Dennis also claims that Experian's error caused his next landlord to demand that Dennis pay a greater security deposit.

**[30]** Here, Gorman submitted evidence that he was refused credit or offered higher than advertised interest rates; the explanations given by the creditors were delinquencies on his credit report; and the only delinquency is the MBNA account. Gorman maintains that he had to borrow money at inflated interest rates, and that he lost wages from the time spent dealing with his credit problems. Under *Dennis*, this is sufficient to establish causation and damages.

## III.   CONCLUSION

For the foregoing reasons, we AFFIRM in part and REVERSE in part the district court's order.