**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN T. SHAW, on behalf of himself and all others similarly situated; KENNETH COKE; RAYMOND RYDMAN, | No. 16-56587 |
| *Plaintiffs-Appellants*, | D.C. No. 3:13-CV-01295-JLS-BLM |
| v. | |
| EXPERIAN INFORMATION SOLUTIONS, INC., | OPINION |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted April 10, 2018
Pasadena, California

Filed May 29, 2018

Before: MARY M. SCHROEDER and MILAN D. SMITH, JR., Circuit Judges, and GERSHWIN A. DRAIN,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Gershwin A. Drain, United States District Judge for the Eastern District of Michigan, sitting by designation.

## SUMMARY[**]

### Fair Credit Reporting Act

The panel affirmed the district court's summary judgment in favor of defendant Experian Information Solutions, Inc., in an action brought under the Fair Credit Reporting Act.

Plaintiffs alleged that Experian, a consumer reporting agency, violated the FCRA in the manner in which it reported short sales on their real property.

The panel held that plaintiffs' reasonable procedures and reasonable reinvestigation claims under 15 U.S.C. §§ 1681e and 1681i failed because plaintiffs' credit reports were accurate.

Plaintiffs' failure to disclose claim under § 1681g failed because Experian clearly and accurately disclosed to them all information that Experian recorded and retained that might be reflected in a consumer report.

Plaintiffs' request for statutory damages under § 1681n failed because they did not show a willful violation by Experian.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Guerino John Cento (argued), Cento Law LLC, Indianapolis, Indiana; Matthew J. Zevin, Stanley Law Group, San Diego, California; for Plaintiffs-Appellants.

Adam Wiers (argued), Jones Day, Chicago, Illinois; Kelly V. O'Donnell, Jones Day, San Diego, California; for Defendant-Appellee.

---

**OPINION**

M. SMITH, Circuit Judge:

Plaintiffs-Appellants John Shaw, Kenneth Coke, and Raymond Rydman (collectively, Appellants) brought this action against Defendant-Appellee Experian Information Solutions, Inc. (Experian), alleging violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.* Between 2010 and 2011, each Appellant executed a short sale on real property that he owned. Appellants brought this action against Experian because of the manner in which Experian reported those short sales. The district court granted summary judgment in favor of Experian on all claims. We affirm.

First, we hold that Appellants' reasonable procedures and reasonable reinvestigation claims fail because Appellants' credit reports were accurate. Second, Appellants' failure to disclose claim fails because Experian clearly and accurately disclosed to Appellants all information that Experian recorded and retained that might be reflected in a consumer report. Third, Appellants' request

for statutory damages under 15 U.S.C. § 1681n fails because they have not shown a willful violation by Experian.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Credit Reporting Industry

Experian is a consumer reporting agency (CRA) as defined by the FCRA.  15 U.S.C. § 1681a(f).  CRAs receive credit information about borrowers and consumers from data furnishers, such as mortgage lenders and credit card companies.  Furnishers generally report their data to CRAs using an agreed-upon format, known as Metro 2. Furnishers' Metro 2 reporting requirements are specified in the Credit Reporting Resource Guide (CRRG), which is published by the Consumer Data Industry Association (CDIA), a CRA trade association.

Once CRAs receive credit information from furnishers, they compile and distribute the information to subscribers through credit reports, and to consumers through consumer disclosures.[1]  Even though it receives its data input in the standardized Metro 2 format, each CRA uses its own proprietary coding format to analyze and report credit information to subscribers.  Experian provides credit reports to approximately 15,000 subscribers.  It delivers its credit reports in a proprietary computer-generated format that displays credit information "in segments and bits and bytes," but Experian provides technical manuals that enable subscribers to read and understand the credit reports they

---

[1] The Consumer Financial Protection Bureau (CFPB) regulates CRAs and enforces the FCRA.

receive.  Subscribers cannot read Experian's reports without these technical manuals.

## II. Short Sales

A short sale is a real estate transaction in which the property serving as collateral for a mortgage is sold for less than the outstanding balance on the secured loan, and the mortgage lender agrees to discount the loan balance because of a consumer's economic distress.  A short sale is a derogatory credit event that furnishers report to CRAs in a particular manner.  By 2009, the CRRG instructed furnishers to report short sales to CRAs using an Account Status Code of "13 or 61-65, as applicable," a Special Comment of "AU (Account paid in full for less than the full balance)," and a Current Balance and Amount Past Due amount of zero.  An Account Status Code of 13 indicates a "[p]aid or closed account/zero balance," while 61 through 65 indicates the account was paid in full and there was a "voluntary surrender," "collection account," "repossession," "charge-off," or "foreclosure . . . started."

When Experian receives data reporting a short sale, it must translate the data into its proprietary coding before it can export the data.  Experian's technical manual describes how it codes short sales:

- Account type: A mortgage-related account, such as a first mortgage or home equity line of credit.

- "Account condition" and "payment status" code: 68, which corresponds to a Special Comment of "Acct legally paid in full for less than the full balance."  The 68 automatically populates a 9 into the first

position on the payment history grid to display the "Settled" status.

- Payment history grid showing the final status ("Settled") in the first digit, followed by 24 months of payment history information.

- Date in 25th month in the payment history grid corresponds to the date the furnisher reported the "Settled" status to Experian.

Thus, in the case of a short sale, the reported account condition code is 68 ("Account legally paid in full for less than the full balance"), which then automatically inserts the number 9 into the payment history grid (to display a "Settled" status).**[2]** But a lead payment history code of 9 can represent multiple derogatory, non-foreclosure statuses. These include "Settled, Insurance Claim, Term Default, Government Claim, Paid by Dealer, BK Chapter 7, 11 or 12 Petitioned, or Discharged and BK Chapter 7, 11 or 12 Reaffirmation of Debt Rescinded."

Foreclosures, on the other hand, are reported with a lead payment history code of 8 and an account condition and payment status code of 94 ("Creditor Grantor reclaimed collateral to settle defaulted mortgage"). According to Experian's technical manuals, it is impossible for Experian's

---

**[2]** Our prospective references to "code combination 9-68" refers to accounts with a lead payment history code of 9 and an account condition code of 68.

credit reports to reflect a foreclosure with a lead payment history code of 9.

Experian prepares consumer disclosures in a more easily read format than the credit reports Experian provides to subscribers.  For example, when an account in an Experian credit report contains code combination 9-68, the consumer disclosure lists "CLS" (Closed) in the lead payment history grid position.  The disclosure also lists the account's status as "Paid in Settlement" with a creditor's statement of "Account legally paid in full for less than full balance."

## III.   Fannie Mae

Fannie Mae is a government-sponsored entity that purchases loans from certain lenders.  The rules governing Fannie Mae's operations restrict which loans it can purchase, and it partly implements those restrictions through its own proprietary software, called Desktop Underwriter.  Fannie Mae also licenses Desktop Underwriter to certain lenders.  Importantly for Appellants, consumers with a prior foreclosure must wait seven years before obtaining a new mortgage through Fannie Mae, whereas consumers with a prior short sale need wait only two years.

When a prospective borrower submits a mortgage application to Fannie Mae, Desktop Underwriter analyzes credit report data about the prospective borrower obtained from CRAs.  In doing so, Desktop Underwriter relies on Fannie Mae's manner of payment code (MOP), which corresponds to Experian's lead payment history code.  Until 2013, Desktop Underwriter "identified [mortgage accounts] as a foreclosure if there [was] a current status or [MOP] of '8' (foreclosure) or '9' (collection or charge-off)."  In other words, Fannie Mae elected to treat code 9 the same as it treated code 8, even though it knew from the instructions

Experian had provided that code 9 did not represent a foreclosure, and that it was "necessarily capturing accounts that [were] not actually foreclosures." Fannie Mae's treatment of lead payment history codes 8 and 9 caused significant adverse consequences because it led Fannie Mae to impose a seven-year waiting period on consumers with a prior short sale, when the waiting period should only have been two years.

## IV.    Discovery of the Reporting Error

In 2010, consumers with prior short sales began notifying Experian that lenders had denied them new mortgages because their files erroneously showed prior foreclosures. In 2011 and 2012, various sources informed Experian that Fannie Mae's Desktop Underwriter software was identifying short sales as foreclosures due to its treatment of Experian's lead payment history code 9. Experian raised this issue with Fannie Mae, but neither entity changed its coding.

Appellants discovered this error during this same time period. Shaw executed a short sale in March 2010. He later ran his information through Desktop Underwriter, which indicated that he had executed a prior foreclosure. When he applied for a new mortgage, the bank used Freddie Mac's (which is distinct from Fannie Mae) underwriting software, and it identified a short sale, not a foreclosure. The bank originated this loan because it understood that Shaw had experienced a prior short sale, not a foreclosure.

Coke executed a short sale in 2011. The next year, he obtained a mortgage from a bank that used an underwriting system other than Desktop Underwriter, and that software correctly identified this short sale. In 2013, the bank attempted to underwrite a different mortgage using Desktop

Underwriter, which identified a possible foreclosure. Coke eventually received a loan from the bank once it recognized that Experian coded the account as a short sale, but he alleges that the loan had a higher interest rate, and this caused him stress and embarrassment.

Rydman executed a short sale in June 2011. In 2013, he applied for a new mortgage, and when the prospective lender used the Desktop Underwriter software, it identified a possible foreclosure, and his loan application was denied. He applied for another mortgage the following year, and received it because the lender did not use Fannie Mae's Desktop Underwriter, and did not identify a potential foreclosure in his credit history. He alleges that the delay in obtaining a new mortgage caused him approximately $55,000 in damages.

Between 2012 and 2013, each Appellant received a copy of his Experian consumer disclosure. Each subsequently disputed Experian's reporting of his prior short sales, and Experian responded to each dispute in 2013.

In early 2013, the CRAs approved a new short sale code, which Experian implemented. In late 2013, Fannie Mae also updated its software to distinguish applicants that had executed short sales from those that had endured foreclosures. In 2014, Fannie Mae further refined Desktop Underwriter to identify foreclosures when there is a MOP code of 8 or foreclosure-related remarks code, and short sales when there are specific short sale-related remarks codes.

## V. Procedural History

After receiving Experian's responses to their disputes, Appellants filed this putative class action in June 2013

against Wells Fargo, CitiMortgage, and Experian for violations of the FCRA. Following the stipulated dismissal of Wells Fargo and CitiMortgage, Appellants filed a second amended complaint alleging three claims against Experian: (1) a reasonable procedures claim pursuant to 15 U.S.C. § 1681e; (2) a reasonable reinvestigation claim pursuant to 15 U.S.C. § 1681i; and (3) a file disclosure claim pursuant to 15 U.S.C. § 1681g. They requested damages pursuant to 15 U.S.C. § 1681n. This case was stayed pending the Supreme Court's resolution of *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892 (2015). After the Court issued its decision in *Spokeo*, and the stay was lifted, Experian moved for summary judgment.

The district court granted summary judgment in favor of Experian, and held: First, Appellants' reasonable procedures and reasonable reinvestigation claims failed because they had not shown that their credit reports were inaccurate. Code combination 9-68 indicated a short sale, not a foreclosure. Second, Appellants' file disclosure claim failed because they did not articulate what information Experian failed to disclose to them. Third, Appellants failed to establish that Experian willfully violated the FCRA pursuant to 15 U.S.C. § 1681n. Appellants timely appealed.

## STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review de novo a district court's grant of summary judgment. *King v. County of Los Angeles*, 885 F.3d 548, 556 (9th Cir. 2018). We may affirm the district court on any ground supported by the record. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1064 (9th Cir. 2016).

## ANALYSIS

The FCRA arose out of "congressional concern over abuses in the credit reporting industry." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995). Congress thus enacted the FCRA in order "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). We apply a liberal construction in favor of consumers when interpreting the FCRA. *Guimond*, 45 F.3d at 1333.

## I. Reasonable Procedures and Reasonable Reinvestigation Claims

15 U.S.C. § 1681e(b) defines the FCRA's requisite compliance procedures, and provides that: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[3] Liability under this reasonable procedures provision "is predicated on the reasonableness of the credit reporting agency's procedures in obtaining credit information." *Guimond*, 45 F.3d at 1333. "[T]he reasonableness of a [CRA's] procedures is 'normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question.'" *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010) (quoting *Sarver v. Experian Info. Sols.*, 390 F.3d 969,

---

[3] A consumer, or credit, report is a CRA-prepared report that a CRA issues to third parties for certain qualifying purposes. *See* 15 U.S.C. § 1681a(d)(1); *Gillespie v. Trans Union Corp.* (*Gillespie I*), 482 F.3d 907, 908 (7th Cir. 2007). The parties do not dispute that the reports generated by Experian for use by Fannie Mae and other lenders are consumer reports.

971 (7th Cir. 2004)). To bring a § 1681e claim, the "consumer must present evidence tending to show that a [CRA] prepared a report containing inaccurate information." *Guimond*, 45 F.3d at 1333.

15 U.S.C. § 1681i(a)(1)(A) outlines the scope of the reinvestigation required "in [the] case of disputed accuracy," and provides, in part, that:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a [CRA] is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer . . . .

In other words, a CRA must conduct a free and reasonable reinvestigation within thirty days of a consumer informing the CRA of disputed information. *See id*. However, what constitutes a "reasonable reinvestigation" will vary depending on the circumstances of the case. *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1160 (9th Cir. 2009). Moreover, although § 1681i "does not on its face require that an actual inaccuracy exist," we, as with § 1681e claims, "have imposed such a requirement." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010). Requiring an inaccuracy, even absent an express statutory mandate, is consistent with the FCRA's purpose "to protect

consumers from the transmission of inaccurate information about them." *Id.* (quoting *Gorman*, 584 F.3d at 1157); *see* 15 U.S.C. § 1681.

Thus, to sustain either a § 1681e or a § 1681i claim, a consumer must first "make a 'prima facie showing of inaccurate reporting'" by the CRA. *Carvalho*, 629 F.3d at 890 (quoting *Dennis v. BEH–1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008)); *see Guimond*, 45 F.3d at 1333 ("In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a [CRA] prepared a report containing inaccurate information."). Here, because Appellants have not made such a showing, we need not consider the reasonableness of Experian's procedures or reinvestigation efforts, and Appellants' § 1681e and § 1681i claims fail.

We first clarified the meaning of "inaccurate" for purposes of the FCRA in *Gorman*. There, we held that information is inaccurate for purposes of 15 U.S.C. § 1681s-2(b) where it either is "patently incorrect" or is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." 584 F.3d at 1163 (quoting *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998)). Consistent with "the maxim of statutory construction that similar terms appearing in different sections of a statute should receive the same interpretation," *United States v. Nordbrock*, 38 F.3d 440, 444 (9th Cir. 1994), we apply the same understanding of "inaccurate" in analyzing § 1681e and § 1681i claims. *See, e.g.*, *Carvalho*, 629 F.3d at 890 (extending *Gorman*'s definition of "inaccurate" to the California Consumer Credit Reporting Agencies Act and citing with approval the holding in *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st

Cir. 2010), that § 1681i "imposes essentially the same obligation" to prove data is "inaccurate" as § 1681s-2(b)).

The only purported inaccuracy to which Appellants plausibly point is Experian's reporting of Appellants' prior short sales. Because Experian has shown that it reported Appellants' short sales using code combination 9-68, we must determine whether this manner of reporting was either "patently inaccurate" or "misleading."

We hold that it was not. First, we conclude that reporting Appellants' short sales using code combination 9-68 was not "patently incorrect." Neither party argues that this code combination does not represent a short sale, and we find no evidence in the record to that effect.

The closer question, and the one on which Appellants rest much of their case, is whether Experian's reporting of Appellants' short sales using code combination 9-68 was misleading. We conclude that it was not. Under this test, imprecision alone does not render a CRA's conduct actionable. Rather, the CRA's reporting must be "misleading in such a way and to such an extent that it [could] be expected to adversely affect credit decisions." *Gorman*, 584 F.3d at 1163 (quoting *Sepulvado*, 158 F.3d at 895); *see also Saunders v. Branch Banking & Tr. Co.*, 526 F.3d 142, 148 (4th Cir. 2008) ("[A] consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression.").

That standard was not met here. Appellants argue that Experian's reporting of Appellants' short sales was misleading because Experian's use of "catchall code 9" in the lead payment history spot caused Fannie Mae to treat the short sales as potential foreclosures. However, this

argument fails to consider that Experian reported Appellants' short sales with code combination 9-*68*. Account status code 68 automatically inserts 9 into the lead payment history spot, signifying that the account is "SETTLED" and "legally paid in full for less than the full balance." This is the very definition of a short sale. Moreover, Appellants point to no authority suggesting that the inclusion of language describing what happens in a short sale, as opposed to the exact term "short sale," is so misleading as to constitute a FCRA violation. Appellants are correct that the statute refers to "maximum possible accuracy," not merely technical accuracy.[4] *See* 15 U.S.C. § 1681e(b). But this does not relieve Appellants of the burden to prove that the inaccuracy is "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Carvalho*, 629 F.3d at 890 (quoting *Gorman*, 584 F.3d at 1163).

We find persuasive the reasoning of a recent district court decision from our circuit addressing this very issue. In *Banneck v. HSBC Bank USA, N.A.*, the plaintiff executed a short sale and Experian reported it with code combination 9-68. No. 15-CV-02250-HSG, 2016 WL 3383960, at *1, *3–4 (N.D. Cal. June 20, 2016). The plaintiff applied for a subsequent mortgage loan, and the lender ran the plaintiff's

---

[4] Appellants rely heavily on *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37 (D.C. Cir. 1984), arguing that we have adopted it in full and that it necessarily compels us to decide this case in their favor. However, we are not bound by *Koropoulos*. Far from adopting it in full, we have quoted it parenthetically only a handful of times, and only in support of the unremarkable definition of "inaccurate." *See Gorman*, 584 F.3d at 1163; *see also Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1108 (9th Cir. 2012). We find no reason to expand our adoption of some of the reasoning of *Koropoulos*, nor would doing so necessarily decide this case in Appellants' favor.

application through Desktop Underwriter, which it had licensed from Fannie Mae. *Id.* at *4. The search triggered a "Refer with Caution" recommendation due to payment history grid code 9. *Id.* The district court reasoned that the plaintiff "has produced no evidence that Experian reported his short sale as anything other than a short sale." *Id.* at *6. Notwithstanding the use of payment history grid code 9, which has multiple meanings, Experian's reporting was not misleading because it "clarifie[d] which credit event [was] actually being reported with an undisputedly clear additional code"—account status code 68. *Id.* at *7. Accordingly, the district court granted summary judgment in favor of Experian due to a lack of inaccurate reporting. *Id.* at *7–8.

We are not swayed by Appellants' attempts to distinguish *Banneck* by arguing that account status code 68 is not "an undisputed clear additional code" for a short sale here. *See id.* ("Experian's simultaneous reporting of the numerical code '68,' which no one disputes refers only to a short sale, ... is dispositive in favor of Experian."). Appellants point to no evidence supporting this argument. To the contrary, Experian's technical manual unambiguously indicates that a status code of 68 means "Account legally paid in full for less than the full balance." Industry experts agree that this is the definition of a short sale. Indeed, even Appellants' complaint acknowledges this is a definition of a short sale. Moreover, the record citations on which Appellants rely reflect concerns only about the lack of clarity in Metro 2 reporting, not Experian's reporting.[5]

---

[5] Appellants point to the Metro 2 special comment code "AU," which has the same meaning as account status code 68—"legally paid in full for less than the full balance." However, code "AU" is part of the

Furthermore, even if code combination 9-68 could stand for other derogatory events and thereby be "misleading," that alone would not render Experian's reporting actionable. The reporting must be "misleading in such a way and to such an extent that it *can be expected to adversely affect credit decisions*." *See Gorman*, 584 F.3d at 1163 (emphasis added) (quoting *Sepulvado*, 158 F.3d at 895); *see also* 15 U.S.C. §§ 1681a(k)(1), 1691(d)(6) (defining adverse action). In this case, classifying a short sale as a foreclosure was the only derogatory event that could have adversely affected credit decisions because it caused various lenders to require that borrowers wait seven, not two, years before obtaining a new loan. *See Gorman*, 584 F.3d at 1163; *see also Williams-Steele v. TransUnion*, 642 F. App'x 72, 73 (2d Cir. 2016) (affirming dismissal of FCRA claims where "inaccuracies in [plaintiff's] credit reports [] had no bearing on her credit-worthiness").

Here, there is no evidence that code combination 9-68 could have represented a foreclosure. When Experian codes foreclosures, it uses a code combination of 8-94, meaning "[c]reditor [g]rantor reclaimed [the] collateral to settle defaulted mortgage." And a foreclosure does not occur where a mortgage account is "legally paid in full for less than the full balance" as occurs with a short sale. Evidence that Fannie Mae employees have, in the past, seen foreclosures coded with lead payment history code 9 fails to recognize that our inquiry is whether code combination 9-68 could represent a foreclosure.

---

Metro 2 system that furnishers use to report to CRAs, not a value that Experian uses in its credit reports. Because Experian does not report code "AU" in its credit reports, code "AU" cannot be classified as an inaccuracy in Experian's credit reports.

Certainly, Fannie Mae's treatment of code 9 on Appellants' accounts as a possible foreclosure could have adversely affected credit decisions when Appellants sought new mortgages.  But this does not render Experian's reporting misleading.  Fannie Mae conceded that it knew that, by treating accounts with code 9 as a foreclosure, it was "necessarily capturing accounts that [were] not actually foreclosures."  Thus, the record before us indicates that the inaccurate reporting of Appellants' short sales was due to Fannie Mae's mistreatment of Experian's coding, not Experian's own inaccuracies.  Appellants introduce evidence that there was "confusion and complaints about code 9," but can point to no other subscribers or underwriting software that could not identify a short sale from code combination 9-68.

Appellants also contend that Experian's reporting was misleading because Experian knew that Fannie Mae was misreading its technical manuals and did not act on this knowledge.  But Appellants cite no case law suggesting that Experian must amend its reporting system when a subscriber disregards its technical manuals in order to avoid liability, and we are aware of none.  Nor would such a rule better achieve the purposes of the FCRA.  Experian provides credit reports to approximately 15,000 users.  The FCRA does not suggest that Experian should be liable for the misconduct of one of those 15,000 subscribers, even if that subscriber is as well known as Fannie Mae.  Nor should Experian necessarily be required to amend its coding to curb a single subscriber's misconduct when all 14,999 other subscribers are apparently accurately reading its manuals.

In sum, Appellants fail to point to any inaccuracies on their credit reports.  Because they fail to meet this threshold burden, we need not consider whether Experian had

reasonable procedures or conducted reasonable reinvestigations when Appellants disputed their credit information. We therefore affirm the district court's grant of summary judgment with regard to Appellants' reasonable procedures and reasonable reinvestigation claims.

## II.  Failure to Disclose Claim

15 U.S.C. § 1681g(a) provides, in part, that "[e]very consumer reporting agency shall, upon request, . . . clearly and accurately disclose to the consumer: . . .[a]ll information in the consumer's file at the time of the request . . . ."  A consumer's file includes "all information on the consumer that is recorded and retained by a [CRA] that might be furnished, or has been furnished, in a consumer report on that consumer." *Cortez*, 617 F.3d at 711–12 (quoting *Gillespie I*, 482 F.3d at 909).  Appellants offer several theories in support of their claim that Experian failed to comply with § 1681(g), all of which fail for the reasons that follow.

First, Appellants argue Experian's consumer disclosures violated § 1681g(a)(1) because Experian placed the designation "CLS" (Closed) in the lead spot on the payment history grid on each consumer disclosure, instead of one of the code 9 statuses.  This argument paints an incomplete picture of Experian's reporting.  Code combination 9-68 means the account's status is "settled," with a special comment of "-Acct legally paid in full for less than the full balance."  Experian reported this same information in Appellants' consumer disclosures:  Their accounts had the status "[p]aid in settlement" with a creditor's statement of "[a]ccount legally paid in full for less than full balance."

Appellants argue that because the status category on a consumer disclosure ("Paid in settlement") is a separate category from the lead digit in the payment history grid on a

credit report, these categories serve different purposes. However, Appellants cite to neither portions of the record nor guiding case law supporting this position. Our inquiry here is whether the disclosure is "understandable to the average consumer," and it is unclear to us how the specific placement of "[p]aid in settlement" on the consumer disclosure could affect a consumer's comprehension. *See Gillespie v. Equifax Info. Servs., LLC*, No. 05 C 138, 2008 WL 4316950, at *6 (N.D. Ill. Sept. 15, 2008) (describing the holding of *Gillespie v. Equifax Info. Servs., LLC* (*Gillespie II*), 484 F.3d 938 (7th Cir. 2007)).  To the contrary, Experian complied with § 1681(g) because it provided Appellants with "[a]ll information in [their] file[s] at the time of the[ir] request[s]" in a form that was both "clear[] and accurate[]." *See* 15 U.S.C. § 1681g(a).

Second, Experian is not required to report the actual code 9 in a consumer disclosure.  Indeed, requiring Experian to provide its proprietary coded data in a consumer disclosure would contradict § 1681g(a)'s requirement that the disclosure be "clear." A consumer who received a disclosure with code 9 on it would likely not be able to "compare the disclosed information from the credit file against the consumer's personal information in order to . . . determine the accuracy of the information set forth in her credit file" because the average consumer would not know what code 9 means. *See Gillespie II*, 484 F.3d at 941.  In order for a consumer to understand code 9, Experian would have to report account status code 68 and release its complicated technical manual, which would further confuse unsophisticated consumers.  Thus, while disclosing code 9 would be "accurate," it would no longer be "clear" and comprehensible to the average consumer.

Third, we reject Appellants' argument that Experian violated § 1681g(a)(1) because "there was a material disconnect between the information displayed in [Appellants'] consumer reports and the information displayed in [Appellants'] consumer disclosures . . . due to the presence of the catchall code 9." This is, in essence, a repetition of Appellants' arguments misinterpreting Experian's coding. While lead payment history code 9 can represent various derogatory statuses, account status code 68 further clarifies the account's status and the specific derogatory event attached to it.

We also note that Experian is not required to report that Fannie Mae mishandled its data. Experian is only required to report "information on the consumer that is recorded and retained by [Experian] . . . in a consumer report." *Cortez*, 617 F.3d at 711 (quoting *Gillespie I*, 482 F.3d at 909). Fannie Mae's misreading of lead payment code 9 is not information retained by Experian in any credit report. Therefore, it falls outside the bounds of a "file" for purposes of § 1681g(a).

Appellants received complete copies of their consumer reports. They are not entitled by the FCRA to information that is not in their report, and they fail to identify what information Experian improperly excluded from its disclosures. We therefore affirm the district court's grant of summary judgment with regard to Appellants' failure to disclose claim.

## III.    Willfulness Pursuant to 15 U.S.C. § 1681n

As we conclude that Experian did not violate the FCRA, Appellants' 15 U.S.C. § 1681n claim must fail. Yet even assuming that Experian violated the FCRA, Appellants fail to show that any violation by Experian was willful. To

recover statutory damages for a violation of the FCRA, Appellants must show that Experian willfully failed to comply with the statute. *See* 15 U.S.C. § 1681n(a); *Safeco*, 551 U.S. at 56–57. A willful violation of the FCRA occurs where a defendant knowingly or recklessly violated the FCRA. *Safeco*, 551 U.S. at 57.

Recklessness is an objective standard. *See id.* at 68–69. A defendant acts in reckless disregard when its action both is "a violation under a reasonable reading of the statute's terms" and "shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

As to Appellants' first two claims, there was no statute, CFPB guidance, or case law that "might have warned [Experian] away from the view it took" or informed Experian that its approach to reporting short sales was objectively unreasonable. *See id.* at 70. To the contrary, the CFPB informed Experian that it had investigated the short sale-foreclosure problem and discovered that the underlying problem was not due to inaccurate reporting by furnishers or CRAs. This agency guidance suggests Experian's conduct, even if it were a violation of the FCRA, was not objectively unreasonable and therefore not reckless. *See id.* at 70 & n.20. While the CFPB "essentially rescinded" this memorandum, it did not inform Experian of this change in its position. Therefore, Experian's only guidance was the prior CFPB memo.

As previously discussed, a district court has agreed with Experian's position regarding the accuracy of its reporting. *See Banneck*, 2016 WL 3383960, at *6. Admittedly, *Banneck* was decided after this litigation began and therefore Experian could not have relied upon its reasoning. But we cannot conclude that Experian's interpretation was

objectively unreasonable when it relied on the guidance of its regulatory agency and at least one district court has subsequently agreed with its interpretation of the FCRA. *See Safeco*, 551 U.S. at 70 n.20 ("Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator.").

Appellants similarly fail to show willfulness as to their failure to disclose claim. Even if Experian had violated § 1681g, we cannot say that Experian acted in an objectively unreasonable manner. Experian's decision not to list code 9 in its consumer disclosures was not objectively unreasonable because the only relevant guidance dictated that consumers are entitled to "complete copies of their consumer reports, not their entire files in whatever form maintained by the CRA." *See Gillespie I*, 482 F.3d at 909. Nor have Appellants pointed to any authority indicating that it was objectively unreasonable for Experian to include the same information in credit reports and consumer disclosures but in different fields or locations. We do not so conclude now. Therefore, Appellants have failed to show willfulness by Experian as required by 15 U.S.C. § 1681n.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Experian.

AFFIRMED.